UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARQUE MOMAN, | ) |
| Plaintiff, | ) |
| | ) No. 18 C 5678 |
| v. | ) |
| | ) Judge Sara L. Ellis |
| JUAN VALENZUELA and ANTHONY MUZILLO, | ) |
| Defendants. | ) |

**OPINION AND ORDER**

On August 20, 2016, fifteen-year-old Plaintiff Marque Moman was involved in a car chase, which culminated in a standoff with Defendants Illinois State Police Lieutenant Juan Valenzuela and Illinois State Police Trooper Anthony Muzzillo on the Chinatown feeder ramp to the Dan Ryan Expressway. Defendants fired shots at Moman's vehicle, hitting Moman several times and causing him neck and chest injuries. Moman filed a lawsuit against Defendants pursuant to 42 U.S.C. § 1983, claiming that Defendants used excessive force. After completing discovery in this case, Defendants filed a motion for summary judgment. Initially, the Court concludes that *Heck v. Humphrey*, 512 U.S. 477 (1994), does not bar Moman's claim. But because the evidence allows only for the conclusion that Defendants acted in an objectively reasonable manner when firing the shots at Moman's vehicle, the Court enters judgment for Defendants.

# BACKGROUND[1]

## I. The Incident

On August 20, 2016, Moman, who was then fifteen years old, and several friends gathered near Kedzie and Maypole in Chicago, Illinois. After police told them to leave, Moman testified that two of his friends told him they bought a BMW and asked him if he wanted to drive it.[2] Moman agreed and began driving the BMW on the Eisenhower Expressway, heading towards the Portillo's near Roosevelt and Canal. While driving, Moman testified that he noticed a white car trailing him, which he did not believe was a police car. Moman did not remember his specific route of travel, but he eventually ended up near Chinatown, stopping the BMW on the Dan Ryan's Chinatown feeder ramp. Moman acknowledged that at some point, he reached 100 miles per hour on the Dan Ryan.

Defendants have a different recollection of the events. Lieutenant Valenzuela, an Illinois State Police officer, testified that as he approached the Dan Ryan bridge, he saw a BMW traveling at a high rate of speed and weaving in and out of traffic. Valenzuela began following the BMW. At approximately 47th Street on the southbound Dan Ryan, Valenzuela called out the license plate of the BMW over the radio and received information that two armed black males around sixteen to eighteen years of age had stolen the BMW earlier that day. While continuing to follow the BMW, Valenzuela observed Moman change lanes multiple times without signaling and pass other motorists on the shoulder. Valenzuela testified that he activated his emergency

---

[1] The Court derives the facts in this section from the Joint Statement of Undisputed Material Facts and Plaintiff's Response. The Court has considered Defendants' objections to Moman's additional statements of fact and included in this background section only those portions of the statements and responses that are appropriately presented, supported, and relevant to resolution of the pending motion for summary judgment. The Court takes all facts in the light most favorable to Moman, the non-movant.

[2] Moman denied knowing that the BMW actually was a stolen car.

lights and sirens when Moman exited at 63rd Street and continued to follow the vehicle as it got back onto the Dan Ryan going northbound.

Trooper Muzzillo, also an Illinois State Police officer, testified that he heard Valenzuela call out the BMW's license plate numbers over the radio and ran the plate on his computer, which provided information that two armed males younger than eighteen with a black 9mm handgun had stolen the BMW earlier that day. Having learned that the BMW was taken using aggravated means, Muzzillo testified that he wanted to catch up to the BMW and so positioned his vehicle on the 35th Street ramp of the northbound Dan Ryan to wait for it to pass. While Muzzillo waited, Valenzuela called out on the radio that the BMW had four occupants and was traveling at nearly 100 miles per hour. When the BMW passed the 35th Street ramp, Muzzillo joined the chase, testifying that although he got his vehicle up to about 100 miles per hour, he could not maintain pace with the BMW. Ultimately, the BMW came to a stop on the Chinatown feeder ramp, unable to maneuver around the cars stopped on the ramp at the traffic light.

After the vehicle stopped, Defendants got out of their cars and approached the BMW with their guns drawn, with Valenzuela on the driver side and Muzzillo on the passenger side. Muzzillo testified that he drew his weapon because of the BMW's excessive speed and recklessness, as well as the high probability that the occupants were armed. Valenzuela similarly testified that he drew his weapon because he believed the BMW had dangerous individuals in it.

As the officers began to approach, Moman opened the driver door but then closed and locked it. Moman testified that he originally intended to let the officers get in the BMW but changed his mind and feared for his life because of the aggressive way Valenzuela approached. Valenzuela testified that he stopped along the rear passenger door on the driver side and tried to get the driver side window open by force and pulled at the door handle to open the door.

3

Meanwhile, due to the sun and the tint on the BMW, Muzzillo moved to its front and looked through the windshield, with his body positioned towards the passenger side. From that position, he testified he viewed all four faces of the occupants in the BMW, noting that Moman looked very young. Muzzillo also testified he saw no weapons inside the vehicle.

Defendants repeatedly commanded Moman and the other occupants of the BMW to put up their hands, not to move, and to open the door, with Muzzillo also warning that he would shoot. While giving these orders with their guns drawn and pointed at the BMW, the BMW started to reverse, according to Moman because he saw the light change and feared for his life. At that point, Muzzillo testified he was not in fear of his life. He remembered attempting to reposition himself by taking a step to the left to allow for way out, but because he could not see all the occupants of the BMW, he returned to the front of the BMW. Moman, on the other hand, testified that he remembered Defendants being on either side of the BMW, with no one in front.

After reversing, Moman turned the BMW and accelerated. He testified that the BMW did not move or accelerate toward either Valenzuela or Muzzillo. Muzzillo recalled, however, that he pushed off the BMW towards the side with his left hand because he believed Moman was about to run him over. And Valenzuela's dash cam video shows the BMW accelerating towards Muzzillo. But Muzzillo easily got out of the BMW's way and then aimed his firearm at Moman and shot one time. Valenzuela also fired three shots at the BMW, with the first shot coming after the BMW had moved only several feet. All of the shots occurred within approximately a one to two second time span. Valenzuela estimated that the entire encounter on the Chinatown feeder ramp, from when he stepped out of his car to the time Defendants fired shots lasted approximately twenty-three to twenty-five seconds.

4

Richard Paisley, a bystander who witnessed the incident, described Moman's driving as he fled the Chinatown feeder ramp as crazy and erratic, leading him to believe that Moman might hit another car or pedestrian while fleeing. Paisley noted Moman's speed and direction and the fact that many people were around the feeder ramp. However, Paisley stated that he did not know why the officers fired their guns because they did not, at first, appear to be in danger, but that once the BMW began moving, he thought someone could have gotten hurt. The following screenshots taken from Paisley's cell phone video and Valenzuela's dashcam show Defendants' positioning at some points while shots were heard:



Doc. 72, Ex. H at 0:00:06 (Paisley's cell phone video).



Doc. 72, Ex. E at VTS_08_01, 0:01:19 (Valenzuela's dashcam video).

Muzzillo testified that he fired at the BMW's driver because he feared getting run over and believed Moman was endangering lives. In Muzzillo's view, when he discharged his

firearm, the BMW remained a threat to him because it could have kept turning and posed a danger to others because Moman exhibited unpredictable behavior. Muzzillo thought that shooting Moman would eliminate the threat of anybody else getting hurt. After the BMW passed him, Muzzillo did not see a reason to fire a second shot, considering the BMW no longer a threat to run him over.

Valenzuela testified that he shot at Moman because he feared that Moman would kill Muzzillo, particularly in light of his knowledge that the BMW had been taken at gunpoint and his observation of Moman turning and accelerating the BMW toward Muzzillo, with Muzzillo disappearing from Valenzuela's sight. But when he fired his third shot, Valenzuela acknowledged that he did not know Muzzillo's location in relation to the BMW.

After Defendants fired the four shots, Moman drove away from the feeder ramp, with Trooper Teresa Allen, who had joined the pursuit from the 35th Street ramp, continuing the pursuit down city streets. Ultimately, Moman exited the BMW at a red light at Roosevelt and Wabash and fled on foot. A stranger, Cindy Richard, picked Moman up and took him to Stroger Hospital. Richard noticed that he had a bullet hole in his neck and testified that he seemed afraid he would die while in her car.

Moman sustained gunshot injuries on the left side of his neck and his left shoulder. Moman testified that the officer to the left side of the BMW shot him. However, the other occupants of the car did not see either officer fire their weapons and could not confirm which one fired. The Illinois State Police found two defects on the driver side of the BMW and one defect on the passenger side of the BMW. The Illinois State Police also recovered one bullet and one bullet fragment from the BMW. The Illinois State Police determined that the bullet fragment came from Valenzuela's firearm but could not identify or eliminate the bullet as having been

fired from either Valenzuela or Muzzillo's firearm. The Illinois State Police also could not identify or eliminate the bullet as having been fired from two other firearms recovered during the investigation.

Though Illinois State Police Directives require troopers involved in a shooting to submit a report within seventy-two hours of the incident, Valenzuela, Muzzillo, and Allen waited five days before submitting their reports on August 25, 2016. Prior to submitting their reports, the officers participated in a lengthy meeting at Illinois State Police's Chicago headquarters, led by, as Allen testified, professional debriefers. In addition to this meeting, Muzzillo testified he sought the advice of an attorney about his report, but he stated that he did not prepare the report with the assistance of counsel.

## II.     Juvenile Adjudication

On March 20, 2018, the Cook County juvenile court found Moman guilty of aggravated possession of a stolen motor vehicle in violation of 625 Ill. Comp. Stat. 5/4-103.2, two counts of aggravated assault in violation of 720 Ill. Comp. Stat. 5/12-2(c)(8), 2(b)(4.1), and one count of aggravated fleeing or attempting to elude a peace officer in violation of 625 Ill. Comp. Stat. 5/11-204.1. The count for aggravated fleeing involved Moman's refusal to obey Trooper Allen's direction. The juvenile court found that Moman knew the BMW was stolen, that "he was fleeing based on that knowledge and he did it in a very dangerous manner that could have gotten himself killed or gotten other people killed," and that "there's no other reasonable explanation as to . . . why the minor would have been fleeing besides the fact that . . . he knew that this vehicle was stolen." Doc. 72, Ex. C, at 122:15–23. The juvenile court further found that the BMW "accelerated forward towards the direction" of Muzzillo and that "it was reasonable for the trooper to believe that he was about to get hit" and thus "was in apprehension of being struck by

7

the vehicle." Ex. C at 123:21–124:2. The appellate court affirmed the juvenile court's judgment on August 14, 2020. *In re M.M*, 2020 IL App (1st) 181991-U, ¶ 2. In coming to its conclusion, the appellate court stated that, "[w]atching the video, it is clear that if Trooper Muzzillo had not moved out of the way as quickly as he did, [Moman] would have struck him with the BMW." *Id*. ¶ 46.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by

8

admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

## ANALYSIS

### I.    *Heck v. Humphrey* Bar

Defendants first argue that because of the inherent inconsistency between Moman's juvenile convictions and his factual claims in this lawsuit, *Heck* bars his excessive force claim. Under *Heck*, a criminal defendant may not use § 1983 to claim damages for "harm caused by actions whose unlawfulness would render a conviction or sentence invalid," unless that conviction or sentence had been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. at 486–87. This is because criminal defendants cannot use § 1983 as a collateral attack on an otherwise valid criminal conviction. *Id*. at 486 ("We think the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments applies to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement").

*Heck* does not necessarily bar all excessive force claims arising during the course of an arrest; finding otherwise would "imply that once a person resists law enforcement, he has invited the police to inflict any reaction or retribution they choose, while forfeiting the right to sue for damages." *McCann v. Neilsen*, 466 F.3d 619, 621 (7th Cir. 2006) (quoting *VanGilder v. Baker*, 435 F.3d 689, 691 (7th Cir. 2006). Instead, where the plaintiff has been convicted of resisting arrest, the claims "can only proceed to the extent that the facts underlying the excessive force claim are not inconsistent with the essential facts supporting the conviction." *Helman v.*

9

*Duhaime*, 742 F.3d 760, 762 (7th Cir. 2014). To determine whether *Heck* bars Moman's claim, then, the Court "consider[s] the factual basis of the claim and determine[s] whether it necessarily implies the invalidity of [Moman's] conviction." *Id.*

Before reaching that question, however, the Court must address Moman's argument that *Heck* cannot apply because his juvenile adjudication is not a conviction. *See People v. Taylor*, 221 Ill. 2d 157, 176 (2006) ("In the absence of a statute expressly defining a juvenile adjudication as a conviction, Illinois courts have consistently held that juvenile adjudications do not constitute convictions."). But *Heck* does not apply solely to formal criminal convictions, as the Supreme Court and the Seventh Circuit have consistently applied *Heck* to plaintiffs who have been civilly committed or to prisoner disciplinary determinations. *See Edwards v. Balisok*, 520 U.S. 641, 646 (1997) ("[I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, *or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid*, a § 1983 plaintiff must prove that the conviction or sentence has been [overturned]." (quoting *Heck*, 512 U.S. at 486–87)); *see also Henderson v. Bryant*, 606 F. App'x 301, 304 (7th Cir. 2015) (*Heck* barred civilly committed plaintiff's challenge to recommitment because "successful damages claim would vitiate basis for his commitment"); *Thomas v. Schmitt*, 380 F. App'x 549, 550 (7th Cir. 2010) (citing *Heck* and explaining that a civilly committed individual could not sue for damages under § 1983 unless his commitment has been invalidated); *Flowers v. Leean*, No. 99-2999, 215 F.3d 1331, 2000 WL 554518, at *2 (7th Cir. May 3, 2000) (same). Moreover, other circuits have held that the *Heck* doctrine can be applied to juvenile delinquency proceedings. *Henry v. City of Mt. Dora*, No. 5:13-CV-528-OC-30PRL, 2014 WL 5823229, at *4 (M.D. Fla. Nov. 10, 2014), aff'd, 688 F. App'x 842 (11th Cir. 2017)("[A] majority of courts that have directly considered whether the *Heck* doctrine applies to

10

juvenile delinquency adjudications have concluded that *Heck* applies, such that it could bar a juvenile's claims under § 1983 if the remaining elements of the *Heck* doctrine are met); *see Morris v. City of Detroit*, 211 F. App'x 409, 411 (6th Cir. 2006) (Court held that *Heck v. Humphrey* is applicable to a juvenile adjudication, though not a criminal proceeding under Michigan statute); *see also Grande v. Keansburg Borough*, No. CIV.A. 12-1968 JAP, 2013 WL 2933794, at *5 (D.N.J. June 13, 2013) ("[T]he *Heck* doctrine bars Plaintiff Annmarie's § 1983 excessive force claim [as] Plaintiff was adjudicated delinquent of aggravated assault in the fourth degree and hindering apprehension."). This Court agrees and finds that the *Heck* doctrine applies to juvenile adjudications.

Now turning to the question at hand, Defendants argue that Moman cannot reconcile his theory of liability with his underlying criminal convictions. Specifically, they contend that Moman's testimony in his deposition makes him out to be "the victim of an unprovoked attack by police," Doc. 73 at 6, which does not square with the juvenile court finding him guilty of aggravated assault based on the fact that he posed a threat to Muzzillo and accelerated the BMW toward him. As the Illinois Appellate Court stated, Moman's conviction of aggravated assault of a peace officer required either "(1) that [Moman] knowingly engaged in conduct that placed Trooper Muzzillo in reasonable apprehension of receiving a battery, knowing that he was a peace officer; or (2) that [Moman], without justification, operated a motor vehicle in a manner that placed Trooper Muzzillo in reasonable apprehension of being struck by the vehicle." *In re M.M.*, 2020 IL App (1st) 181991-U, ¶ 45 (citing 720 Ill. Comp. Stat. 5/12-2(b)(4.1) and 720 Ill. Comp. Stat. 5/12-2(c)(8)). In his deposition testimony, however, Moman continued to deny that he ever placed Muzzillo in danger and contradicted the juvenile court's findings. In other words, his deposition testimony implies the invalidity of his conviction and so would make his claim *Heck-*

11

barred. *See Tolliver v. City of Chicago*, 820 F.3d 237, 243 (7th Cir. 2016) (*Heck* barred an excessive force claim because the plaintiff's version of the shooting implied the invalidity of his conviction for aggravated battery of a peace officer where there was no "acknowledgment of the mental state necessary for a conviction for aggravated battery"); *Douglas v. Vill. of Palatine*, No. 17-cv-6207, 2020 WL 1469439, at *4 (N.D. Ill. Mar. 26, 2020) (*Heck* barred a plaintiff's claim where his version of the events was "inconsistent with the findings of fact necessary to his conviction for aggravated assault on a police officer"); *Teague v. Armstead*, 82 F. Supp. 3d 817, 825 (N.D. Ill. 2015) ("Teague's theory, and the evidence Teague has offered supporting it, presents a 'clear sequence of events' that, if affirmed in a civil judgment for Teague, would necessarily invalidate his criminal conviction for assaulting Officer Armstead. The reason is simple: Teague's version of the events and Officer Armstead's version of the events (which was adopted by the trial court) are mutually exclusive.").

But here, Moman acknowledges in his response that he accepts the necessary findings of the juvenile court and so does not seek to rely on his deposition testimony to the extent it is inconsistent with his juvenile adjudication. In light of this concession, *Heck* does not bar Moman's excessive force claim. *See Tolliver*, 820 F.3d at 244 ("If Tolliver had conceded that he voluntarily and intentionally or knowingly drove towards the officers, or if Tolliver had even remained agnostic on who struck the first blow, he could have brought a claim that the officers' response of firing fourteen bullets at him constituted excessive force and that claim would not be barred by *Heck*." (footnote omitted)); *Gilbert v. Cook*, 512 F.3d 899, 902 (7th Cir. 2008) ("An argument along the lines of 'The guards violated my rights by injuring me, whether or not I struck first' does not present the sort of inconsistency that [requires application of the *Heck* doctrine]."). Thus the Court disregards Moman's allegations and testimony to the extent they are

inconsistent with the juvenile court's adjudication, considering instead whether, under the facts as found by the juvenile court, Moman has created a genuine issue of fact as to whether Defendants used excessive force against him. *See Mordi v. Zeigler*, 870 F.3d 703, 708 (7th Cir. 2017) ("[E]ven if Mordi filed a complaint that included some *Heck*-barred contentions and other cognizable arguments, we have held that the proper response is not to toss the entire complaint. Instead, the judge must carve off any *Heck*-barred contentions and proceed with what remains."); *Rotter v. Elk Grove Vill.*, No. 14-cv-7583, 2017 WL 3478816, at *5–6 (N.D. Ill. Aug. 14, 2017) (*Heck* did not bar a plaintiff's claims where the plaintiff did "not adhere to a position incompatible with his guilty plea; rather, he made it clear in his response brief that he is amenable to the Court disregarding his allegations and testimony that are inconsistent with his guilty plea and permitting him to proceed with his remaining claims").

## II. Excessive Force Claim

Defendants next argue that Moman's excessive force claim fails as a matter of law. Specifically, Defendants contend that Moman's excessive force claim fails because (1) he has no evidence that Muzzillo seized him, (2) Defendants' use of force was legally justified, and (3) qualified immunity bars Moman's claims. The Court will address these arguments in turn.

### A. Seizure

Because the Court analyzes an excessive force claim under the Fourth Amendment's prohibition of unreasonable seizures, *United States v. Collins*, 714 F.3d 540, 543 (7th Cir. 2013), Moman must first establish that Defendants seized him. Under the Fourth Amendment, a seizure occurs when an officer applies physical force to restrain an individual's freedom of movement "even when it is ultimately unsuccessful" or when an officer makes a show of authority that successfully causes the individual to yield. *California v. Hodari D.*, 499 U.S. 621, 625–26

(1991); *see also United States v. Griffin*, 652 F.3d 793, 798 (7th Cir. 2011) ("In other words, there are two kinds of seizures: those effected through physical force and those effected through a show of authority and submission to the assertion of authority."). Here, Moman fled instead of yielding to any show of authority, so the only way he can proceed on his claim is if he can show that Defendants applied physical force to him. Defendants do not argue that Valenzuela did not seize Moman; rather, they aim this argument solely at whether Muzzillo also effectuated a seizure of Moman, contending that the evidence does not show that Muzzillo applied physical force to Moman.

Defendants acknowledge that Muzzillo discharged his firearm but argue that no evidence suggests that the bullet he fired struck Moman. Admittedly, the record does not identify which Defendant's bullets actually struck Moman, as neither party presents any ballistics analysis on the bullets that hit Moman. But the evidence does show that, of the four bullets fired, one bullet hole was found on the passenger's side of the BMW and two bullet holes were found on the driver's side. Defendants contend, however, that the defect on the passenger's side did not penetrate the pillar between the driver and passenger door, meaning that Moman's bullet did not enter the car. Defendants further note that Moman's injuries occurred on his left side, and he testified that the person on the left side of the car, i.e., Valenzuela, shot him. That said, although the Illinois State Police traced the bullet fragment found in the BMW to Valenzuela's gun, they could not identify or eliminate the source of the bullet found in the car. The uncertainty surrounding whose bullets hit Moman create a genuine issue of fact as to whether Muzzillo physically seized him. Indeed, the issue may not be determinative, given that both Valenzuela and Muzzillo fired at Moman and it remains undisputed that Muzzillo's shot at least hit the BMW. *See Richman v. Sheahan*, 512 F.3d 876, 884 (7th Cir. 2008) (when "it is unclear which

14

defendant's act was the one that inflicted the injury—both shot at the plaintiff, one missed, but we do not know which one missed. . . . both are jointly and severally liable."); *United States v. Bradley*, 196 F.3d 762, 768 (7th Cir. 1999) (seizure by physical force occurred when a police officer fired a bullet that lodged in the driver's seat of his station wagon); *cf. Valle v. City of Chicago*, 333 F. Supp. 3d 800, 806 (N.D. Ill. 2018) ("The shots fired by Weingart and the other officers do not qualify as 'physical force,' for purposes of a Fourth Amendment seizure, because Plaintiff has not alleged that the bullets struck him or his vehicle."). Therefore, the Court finds for purposes of this summary judgment motion that both Defendants seized Moman and proceeds to consider whether both Defendants' use of force was justified.

### B. Objective Reasonableness

Although "a police officer may constitutionally use deadly force to defend himself and others in certain situations," that use of force must be objectively reasonable. *Horton v. Pobjecky*, 883 F.3d 941, 948–49 (7th Cir. 2018); *see Graham v. Connor*, 490 U.S. 386, 395 (1989). To determine the reasonableness of the use of force, the Court reviews the totality of the circumstances and engages in a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014) (quoting *Graham*, 490 U.S. at 396). When balancing these competing factors, the Court considers "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The Court evaluates reasonableness from the "perspective of a reasonable officer on the scene" and not with "20/20" hindsight. *Id*. Therefore, Defendants' subjective motivations and hindsight explanations are not

relevant. *See Horton*, 883 F.3d at 950 ("The actual officer's subjective beliefs and motivations are irrelevant."); *id.* at 952 ("[E]ven if Pobjecky subjectively did not intend to prevent Michael from escaping by shooting him, that does not mean it was objectively unreasonable to shoot Michael to prevent him from escaping.").

    First, Defendants argue that they justifiably shot at Moman because Moman posed a threat to Muzzillo. "[W]hen an individual threatens a police officer with a deadly weapon, the officer is permitted to use deadly force in self-defense if the use is consistent with the principles set forth in *Tennessee v. Garner* [471 U.S. 1, 11–12]." *Scott v. Edinburg*, 346 F.3d 752, 757 (7th Cir. 2003). "[A]n automobile may be used as a deadly weapon." *Id.* But once the threat passes, an officer no longer retains the right to shoot. *See Horton*, 883 F.3d at 950 ("Even though an officer may in one moment confront circumstances in which he could constitutionally use deadly force, that does not necessarily mean he may still constitutionally use deadly force the next moment."); *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity.").

    Here, Moman cannot dispute that he drove toward Muzzillo and so instead argues that by the time Muzzillo shot at him, Muzzillo had reached a place of safety. Indeed, Muzzillo acknowledges that he was able to get out of the BMW's way and that he shot at Moman from the side of the vehicle. But the Paisley cell phone video and Valenzuela's dash cam video all suggest that Muzzillo may still have been in the path of the vehicle when he shot, and the timing of his shot is simply not clear. Muzzillo additionally maintains that given Moman's erratic driving, this did not take him out of harm's way. Therefore, a question of fact exists as to whether an officer in Muzzillo's position would have reasonably perceived he remained under

16

threat at the time Muzzillo shot at Moman. *See Scott*, 346 F.3d at 757–58 (genuine issue of fact existed as to the timing of the officer's shot because, "[i]f the fatal shot was fired while Mr. Scott was driving away, then the argument that Officer Edinburg was compelled to fire in order to protect himself would be significantly weakened"); *Quade v. Kaplan*, No. 06 C 1505, 2008 WL 905187, at *9 (N.D. Ill. Mar. 31, 2008) (genuine issues of fact existed as to whether the plaintiff posed a threat to the officer where the parties disputed whether the plaintiff was driving toward the officer when the officer fired at the plaintiff).

This does not end the inquiry, however, as Defendants also argue that they justifiably shot at Moman because Moman posed a danger to others and they sought to prevent his escape. "A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death." *Scott v. Harris*, 550 U.S. 372, 378 (2007). Further, "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Garner*, 471 U.S. at 11–12.

Here, prior to the stop on the Chinatown feeder ramp, Defendants observed Moman driving recklessly, weaving in and out of traffic at a high rate of speed and thus posing a grave public safety risk. *See Plumhoff*, 572 U.S. at 776 ("[O]utrageously reckless driving posed a grave public safety risk."). Even when he ran into stopped traffic on the ramp, he continued his attempt to maneuver around cars, posing a danger to the other vehicles on the ramp and the bystanders at the intersection. In fact, the juvenile court established that Moman acted in a very dangerous manner that could have gotten himself or others killed. Doc. 72, Ex. C, at 122:20–24.

17

Defendants also knew that the BMW had been stolen earlier that day by armed teenagers, information that could lead a reasonable officer to believe the occupants to be dangerous. And, although Valenzuela testified that he could not necessarily see Muzzillo as the BMW accelerated, Valenzuela testified that he knew Muzzillo had been in front of the car and had disappeared from sight at some point. Under these facts, none of which Moman can dispute, an officer in Defendants' position could justifiably use deadly force to protect others and prevent Moman's escape. *See Plumhoff*, 572 U.S. at 777 ("Under the circumstances at the moment when the shots were fired, all that a reasonable police officer could have concluded was that Rickard was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road. . . . [I]t is beyond serious dispute that Rickard's flight posed a grave public safety risk, and here, as in *Scott*, the police acted reasonably in using deadly force to end that risk."); *Ybarra v. City of Chicago*, 946 F.3d 975, 980 (7th Cir. 2020) (officers reasonably used deadly force to prevent escape to protect others even after the decedent drove past the officers) *Ellis*, 999 F.2d at 247 ("If Ellis had threatened the officer with a weapon and then run off with the weapon, a reasonable officer in Wynalda's place could believe that Ellis created a danger to the community."). Therefore, the Court finds it appropriate to grant summary judgment for Defendants.[3]

---

[3] Defendants also argued that qualified immunity protects them from liability. Because the Court finds no constitutional violation, it does not need to engage in the qualified immunity analysis.

18

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment [71]. The Court enters judgment for Defendants and terminates this case.

Dated: August 2, 2021

_____
SARA L. ELLIS
United States District Judge